UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TYAJAH WILLIAMS,

Plaintiff,

v.

RECOVERY INNOVATIONS INC et al.,

Defendants.

CASE NO. 3:24-cv-05496-DGE

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT
(DKT. NO. 37)

Before the Court is Defendants Recovery Innovations Inc. ("RI") and Michael Giles's

motion for summary judgment.  (Dkt. No. 37.)  Plaintiff Tyajah Williams opposes the motion.

For the reasons that follow, Defendants' motion is GRANTED.

**I        FACTUAL AND PROCEDURAL BACKGROUND**

**A.  Plaintiff's Employment**

RI offers community-based services to "individuals living with behavior health and/or

substance use challenges."  (Dkt. No. 44 at 1.)  Plaintiff is a Black woman who was hired as a

Milieu Specialist at RI's Parkland, Washington facility on September 29, 2022.  (*Id.*; Dkt. No.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 1

47-31 at 4, 50.) Plaintiff testified that during her employment, she had "uncomfortable situations with RI" but she understood it was "just a job, so [she] came in and performed to the best of [her] ability." (Dkt. No. 47-31 at 5.) She was generally considered a good employee by her colleagues (*see* Dkt. Nos. 43, 45, 46) but had persistent attendance issues, which eventually led to her receiving written discipline for her tardiness on May 17, 2023.[1] (Dkt. No. 39-12 at 2–3.)

Plaintiff testified in her deposition that she was "very vocal" when she felt uncomfortable or felt as if she were mistreated at work. (Dkt. No. 47-31 at 5.) One such complaint involved a white female colleague named "Jane" who apparently told RI management that Plaintiff was yelling at her when Plaintiff was not; Plaintiff took these comments to be "'subliminal racism,'" which she defined as "when we're [as Black people] very passionate or firm to our statements, we'd be told that we're yelling or we're aggressive." (Dkt. No. 39-1 at 3.) Plaintiff spoke with Tammy Simmons, an RI Program Supervisor,[2] about these allegations because they were "hindering [her] work performance." (Dkt. No. 47-31 at 6.) Simmons, who is also Black, told Plaintiff not to worry about Jane's allegations, "because she kn[ew] [Plaintiff's] character." (*Id.*) Plaintiff recalled Simmons told her, "[U]nfortunately this is what we deal with as [B]lack women, so basically to suck it up and continue to do the best [Plaintiff] could do." (*Id.* at 6.) When asked directly in her deposition, Plaintiff testified this situation was her only evidence of race discrimination. (*See* Dkt. No. 39-2 at 14–15.)

---

[1] Plaintiff had "transportation issues" but had apparently worked out an arrangement early on in her employment where she would communicate with her shift supervisor ahead of time when she was going to be late. (Dkt. Nos. 39-12 at 4; 47-31 at 5.) Plaintiff was encouraged to write a letter to management to explain the arrangement after she was disciplined. (Dkt. No. 47-31 at 5.)

[2] Simmons became the Washington State Director at some point in 2023 but the record indicates she was still a Program Supervisor during the relevant timeframe. (*See* Dkt. Nos. 47-31 at 53–54; 47-32 at 61–62.) She is no longer employed by RI. (Dkt. No. 47-32 at 74.)

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 2

Other workplace friction included the "numerous" complaints Plaintiff made when "[p]roper policy wasn't being followed" for accepting clients to the facility, such as when there were not enough beds or when clients came in sick, which made her feel "unsafe." (Dkt. No. 47-31 at 7.) She did not believe her complaints were "taken seriously," but she did feel Simmons or another mental health provider on the floor were "open to hearing what [she] had to say." (*Id.*) When asked in her deposition if she was discriminated against for raising these concerns, Plaintiff replied, "[n]ot to my knowledge." (*Id.*) Similarly, Plaintiff made a "few complaints" about her shift supervisor Michael Giles, whom Plaintiff believed had an "aggressive demeanor." (*Id.*) She also did not "receive any retaliation" for making these complaints. (*Id.*)

On June 28, 2023, Plaintiff and Giles, who is also Black, were "involved in an incident" that stemmed from a disagreement about proper care management for RI's clients. (*Id.*; Dkt. No. 39-5 at 2.) Plaintiff described Giles as "towering over [her]" and "speaking down at [her] with derogatory statements"; she clarified in her deposition that Giles told her she didn't have "room to talk" because of her age and her "credentials and schooling." (Dkt. Nos. 39-2 at 16; 39-5 at 2.) She later characterized the incident as more of a "belittling conversation" than an argument. (Dkt. No. 47-31 at 43.) Plaintiff was upset by the incident and after notifying a supervisor was "approved to go home with time covered." (Dkt. No. 39-5 at 3.) She testified that aside from these comments, she did not believe there was other evidence the altercation was discriminatory in some way. (Dkt. No. 39-2 at 16; *see also* Dkt. No. 47-31 at 43 (Plaintiff identifying Giles's statement was about her "educational background" and not her race).)

Two days later, on June 30, Plaintiff described in an email to RI management that she had heard from a "former employee"—who was informed by an unnamed "E&T" staff member—that Giles threatened to come to work with an "'AR 15 and a bullet proof vest to come after

[Plaintiff].'"[3]  (Dkt. No. 39-5 at 3.)  Plaintiff explained she was experiencing a "high amount of depression and anxiety" because of the conflict with Giles and alleged threat.  (*Id.*)  She asked management staff "what forms [she] need[ed] to fill out for compensation for time lost due to this situation of not feeling safe in the work place."  (*Id.*)  Plaintiff stated she "[did] not feel comfortable returning to work at this present moment"; it does not appear from the record Plaintiff ever returned to work after the June 28 incident.  (*Id.*)  On Monday, July 3, Plaintiff was informed the matter was escalated to human resources for "further investigation."  (*Id.* at 2.)

## B.  Plaintiff's Leave and Termination

On Thursday, July 6, 2023, Plaintiff submitted a Washington Paid Family Medical Leave ("PFML") "Medical Certification Serious Health Condition" form, requesting leave from June 28 through September 28.  (Dkt. No. 39-6 at 3.)  The description of the serious health condition read, "High conflict w/ Supervisor . . . resulting in Adjustment disorder w/ Anxious mood."  (*Id.*)  Senior HR Generalist Melissa Greaig responded the following day approving Plaintiff's leave and letting her know she would reach out later that afternoon to discuss Plaintiff's complaint against Giles.  (*Id.* at 2.)  Plaintiff responded and asked for information about the investigation and workers' compensation.  (Dkt. No. 39-7 at 4.)  Greaig's next email indicated the parties spoke on the phone; she followed up with instructions on how to file a workers' compensation claim.  (*Id.* at 3.)  When Plaintiff again inquired about the status of the investigation on July 17, she was informed by Strategic HR Business Partner Staci Byers that her workers' compensation

---

[3] The former employee was identified in Plaintiff's depositions as Diana Thomas.  (Dkt. No. 39-2 at 9.)  Plaintiff believed E&T was an "agency" that was associated with RI but located in a separate building, but she did not know for certain.  (*Id.* at 10.)  The identity of the unnamed E&T employee was never disclosed.  (*Id.* at 9.)  In any case, this statement is hearsay and would likely be inadmissible at trial.  *See Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 157 (S.D. Cal. 2022) (papers opposing summary judgment may not be supported by hearsay unless the hearsay evidence could be presented in an admissible form at trial).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 4

claim was denied "pending additional information" and the investigation into Giles had concluded. (*Id.* at 2.) Byers informed Plaintiff that RI had not contacted her "to allow [her] the time [she] needs" while on leave, but once Plaintiff returned, "[they would] go over the findings of the investigation." (*Id.*) RI did not hear from Plaintiff again for over two months.

The only real factual dispute in this case regards notice of Plaintiff's PFML leave. Plaintiff apparently began receiving PFML benefits from the state "a month or so" after she filed her claim. (Dkt. No. 47-31 at 13.) She eventually filed a complaint with the PFML Employment Security Department on August 11 stating RI was "causing a delay in the determination of PFML by not submitting the required information that has been requested." (*Id.* at 72–73.) Plaintiff testified in her deposition that RI did not respond to the state agency's inquiries to process her claim, but she did not know when, by what means, or how frequently the agency attempted contact with RI, nor was she certain that RI actually received notice of her benefits. (*Id.* at 13, 18, 37.) In her deposition, Lead Benefit Specialist McKenna Haig testified RI never received approval of Plaintiff's leave from the state agency or from Plaintiff. (Dkt. No. 47-33 at 51–54, 121.) Haig testified she made "multiple calls" to the agency to attempt to verify Plaintiff's leave dates but was unsuccessful. (*Id.* at 66.) As far as RI's benefits department was aware, Plaintiff was on "unapproved pending leave status" for the duration of her leave. (*Id.* at 86–87.)

On September 13, with her "date of return [] rapidly approaching," Plaintiff reached out to RI to inquire about the "necessary steps" for her return. (Dkt. No. 47-18 at 2.) She also requested "an update of expectations of an employee now and/or the resolution (accommodations) for the investigation." (*Id.*) It does not appear anyone responded to this

email.[4]  On September 26, Plaintiff contacted Program Supervisor Wendy Milton regarding her return to work on October 1; Milton told Plaintiff the benefits department would reach out.  (Dkt. No. 44 at 23–24.)  On September 27, Haig emailed Plaintiff's personal email with next steps to facilitate Plaintiff's return to work.  (Dkt. No. 47–31 at 80–81.)  Specifically, Haig requested Plaintiff complete a "'Return to Work' form that outlines any restrictions, if applicable, and confirms that [she is] medically cleared to resume [her] duties."  (*Id.* at 80.)  Plaintiff did not respond to this email.  On September 29, Plaintiff emailed several RI employees from her work email address and shared, "My return to work date is set for October 1, 2023.  I am mentally ready and excited to continue with my position as a[] Milieu Specialist[.]"  (Dkt. No. 39-9 at 3.)  Haig responded and forwarded her September 27 email requesting Plaintiff complete a return-to-work form.  (*Id.* at 2.)  In her response, Plaintiff again requested information about Giles's investigation.  (*Id.*)  She did not acknowledge the return-to-work form or other steps outlined by Haig.  (*Id.*)

October 1 came and went.[5]  RI has a three-day "no-call, no-show" policy, where employees that have not shown up to work, or notified anyone of circumstances preventing them from showing up, are presumed to have resigned after three days.  (Dkt. Nos. 39-1 at 11; 39-10 at 12.)  Haig testified Plaintiff did not attempt to contact her supervisor or communicate that she was taking steps to submit the return-to-work form, nor did she request additional time or inform

[4] Breanne Wolfgram, RI's corporate representative, testified in her deposition that this email was addressed to two individuals, neither of whom were employed by RI at the time Plaintiff sent the September 13 email.  (Dkt. No. 47-37 at 143.)  Wolfgram was unaware if Plaintiff knew that these employees no longer worked for RI but stated Plaintiff had not contacted either of them previously.  (*Id.* at 143–144.)

[5] Plaintiff's schedule was Sunday through Tuesday, with "alternate Wednesdays."  (Dkt. No. 47-31 at 24.)  October 1, 2023, was a Sunday and would have been a normal workday for Plaintiff.  (*Id.*)

RI that she had made an appointment to get her physician's sign-off on her return.  (Dkt. No. 47-33 at 129, 131.)  Haig clarified that in similar situations, she "typically [saw]" employees provide more information to HR to "ensure that they could return at a later date." (*Id.* at 131–132.) Plaintiff herself confirmed she did not communicate with RI between September 29 and October 5, and when asked why she never reached out to RI about scheduling a doctor's appointment, she stated, "I don't know.  There was no reason why.  I just didn't." (Dkt. No. 47-31 at 25.)  Haig similarly testified that Plaintiff never contacted RI about her return.  (Dkt. No. 47-33 at 127–129.)

On October 5, Wolfgram emailed Plaintiff to "formally address [her] failure to return to work following [her] approved leave of absence." (Dkt. No. 39-11 at 3.)  Wolfgram cited Plaintiff's failure to return to work and her "extended absence without prior notice or communication" as evidence of Plaintiff's resignation: "Your employment at RI International is terminated as of 10/5/2023." (*Id.*)

Plaintiff responded less than an hour later stating she had "no knowledge of any communication regarding return from leave from the HR Department that I have not responded to[.]" (*Id.* at 2.)  She requested her personnel file and complained that she had received "little to no communication" from HR during her leave but did not address the return-to-work form. (*Id.*) She then emailed Wolfgram a second time and finally confirmed her receipt of the return-to-work form, sharing the "soonest availability" her provider could see her was October 27. (*Id.*) Wolfgram responded that RI was "unable to continue employment based on the failure to return" and wished Plaintiff the best in the future.  (Dkt. No. 44 at 30.)

**C. Plaintiff's Lawsuit**

Plaintiff initiated her lawsuit against Defendants in Pierce County Superior Court on May 30, 2024.  (Dkt. No. 1-1.)  She alleged seven causes of action: (1) discrimination in violation of the Washington Law Against Discrimination ("WLAD"), Washington Revised Code § 49.60 *et seq.*; (2) failure to accommodate;[6] (3) retaliation in violation of the WLAD; (4) retaliation pursuant to the Family and Medical Leave Act ("FMLA") and the PFML; (5) whistleblower retaliation; (6) wage theft; and (7) unlawful discharge in violation of public policy.  (*Id.* at 6–9.)  Because Plaintiff explicitly invoked the FMLA, and because her second cause of action could be construed to invoke the Americans with Disabilities Act ("ADA"), Defendants timely removed the case on June 24, 2024.  (Dkt. No. 1 at 3–4.)

**II        SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

---

[6] The complaint did not specify which provision or statute this claim was brought under.  (Dkt. No. 1-1 at 6–7.)

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 8

material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv. Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

### III     DISCUSSION

**A. Nature of the Allegations and the Parties' Arguments**

Defendants' overarching theory is that there was a perfectly legitimate reason for terminating Plaintiff, notwithstanding her allegations: She failed to return from leave on the day she selected and failed to communicate in any way for five days after confirming her return. In their motion for summary judgment, Defendants argued none of Plaintiff's claims should survive. They highlighted her uncertainty about key facts, including how she was discriminated against, by whom, what conduct she engaged in that led to retaliation against her, and whether she took official PFML or FMLA leave (or was even eligible for it). (Dkt. No. 37 at 2.)

Defendants argued Plaintiff is unable to show that any adverse action was taken against her on the basis of any protected category under the WLAD, nor can she establish a prima facie case of discrimination or overcome the *McDonnell Douglas* burden-shifting framework on her discrimination claims. (*Id.* at 8–12.) Defendants again pointed to the "nondiscriminatory reason" for their decision to terminate her after she did not call or show up to work, or otherwise communicate with her supervisors, even as her return-to-work date passed. (*Id.* at 12–13.) Defendants argue Plaintiff's failure to accommodate claim fails as well, because she never requested a disability accommodation to her job duties following her return from leave. (*Id.* at 14–15.)

As for Plaintiff's various claims for WLAD retaliation, whistleblower retaliation, and unlawful discharge, Defendants asserted Plaintiff cannot identify that she opposed any forbidden employment practices, nor that she reported any "clear mandate" of public policy—let alone that her discharge was sufficiently linked to her reporting of either. (*Id.* at 15–16, 19–23.) Plaintiff's claims for FMLA and PFML retaliation fail, according to Defendants, because Plaintiff was ineligible for FMLA at the time she took leave, and she has not shown evidence that RI was aware of any PFML leave approved by the state. (*Id.* at 17–18.) Without RI's knowledge of PFML leave, Defendants argued Plaintiff cannot prove she was retaliated against for taking it. (*Id.* at 19.)

Plaintiff does not meaningfully contest the basic facts underlying this case. Instead, she argued the evidence shows she was subjected to a work environment that was hostile to Black women and disabled people and that she was terminated while on mental health leave. (Dkt. No. 48 at 2.) In her response, she argued she has made out a prima facie case of disparate treatment discrimination because she was treated "significantly less favorably" in the terms and conditions

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 10

of her employment, and "no other employee however situated was treated as poorly" as she was. (*Id.* at 16.) She similarly asserted she has made out a claim of hostile work environment discrimination because she was "forced to endure" insults and stereotypes from her white coworker Jane and was yelled at by Giles, who Plaintiff stated "had already demonstrated he was sexist towards women." (*Id.* at 17.) Plaintiff argued her failure to accommodate claim should survive because RI was aware of her mental health disability and still refused to provide her with information related to Giles's investigation while she was on leave. (*Id.* at 19–20.)

In support of her retaliation and unlawful discharge claims, Plaintiff pointed to her various reports to RI management, and her request for leave, as examples of statutorily protected activity. (*Id.* at 21.) She argued she suffered adverse employment actions as a result of these activities, and concluded Defendants have not offered an "overriding justification" for her termination. (*Id.* at 21–22.)

**B. Analysis**

**1. WLAD Discrimination**

The WLAD prohibits employment discrimination on the basis of sex, race, disability, and other protected characteristics. Wash Rev. Code § 49.60.030(1)(a). The legislature has directed Washington courts to "liberally construe" the WLAD's provisions to accomplish the act's purpose. *Bittner v. Symetra Nat'l Life Ins. Co.*, 558 P.3d 117, 187 (Wash. Ct. App. 2024) (citing Wash Rev. Code §§ 49.60.010; 49.60.020). Washington courts employ the *McDonnell Douglas* burden-shifting framework in evaluating WLAD cases.[7] *Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018) (en banc).

---

[7] Under the first prong of the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Scrivener v. Clark Coll.*, 334 P.3d

Plaintiff's complaint referenced five "courses of conduct" under the WLAD: "(a) hostile work environment; (b) discrimination in the terms and conditions of employment; (c) retaliation; (d) constructive discharge; and (e) wrongful discharge." (Dkt. No. 1-1 at 6.)  Defendants attempted to address them all in their motion for summary judgment (*see* Dkt. No. 39 at 8–13), but in her response, Plaintiff only responded to the arguments attacking her claims of disparate treatment and hostile work environment discrimination (*see* Dkt. No. 48 at 14–18).  The Court will therefore limit its analysis to the same and finds the others abandoned.  *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("[Plaintiff] abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment"); *Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) (affirming summary judgment on a claim when the plaintiff failed to raise it opposition to the motion for summary judgment).

### a.  Disparate Treatment

"Disparate treatment occurs when an employer treats some people less favorably than others because of race, color, religion, sex, or other protected status." *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 615 (Wash. Ct. App. 2013).  A disparate treatment discrimination claim requires the plaintiff to show that their employer treats some people less favorably than others because of their protected status.  *Id.* at 616.  This can be done by either satisfying the *McDonnell Douglas* burden shifting test, *see* n.7 *supra*, or by offering direct evidence of an employer's discriminatory intent.  *Alonso*, 315 P.3d at 616.  To make a prima facie case of discrimination under the *McDonnell Douglas* framework, the plaintiff must

541, 546 (Wash. 2014) (en banc).  If the plaintiff makes their prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Id.*  If the defendant meets this burden, the third part of the test requires the plaintiff to produce sufficient evidence that the defendant's nondiscriminatory reason was pretextual.  *Id.* (citation omitted).

establish (1) they belong to a protected class; (2) they were treated less favorably in the terms of conditions of their employment (3) than a similarly situated comparator; and (4) the plaintiff and comparator were doing "substantially the same work." *Johnson v. Dep't of Soc. and Health Servs.*, 907 P.2d 1223, 1231 (Wash. Ct. App. 1996).  Under the direct evidence test, a plaintiff must provide evidence that "(1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision." *Alonso*, 315 P.3d at 616.

To defeat a motion for summary judgment, an employee "must do more than express an opinion or make conclusory statements." *Hiatt v. Walker Chevrolet Co.*, 837 P.3d 618, 624 (Wash. 1992) (en banc).  The employee must establish "specific and material" facts to support each element of the prima facie case. *Brooks-Joseph v. City of Seattle*, 697 F. Supp. 3d 1085, 1099 (W.D. Wash. 2023).  If the prima facie case is not met, "the defendant is entitled to prompt judgment as a matter of law." *Id.*  Such prompt judgment is warranted here.

Plaintiff appears to take the *McDonnell Douglas* route (*see* Dkt. No. 48 at 15–16), but she has not made any effort to identify a single similarly situated comparator—let alone demonstrate she was treated differently than them. (*Id.* at 16) ("*no other employee however situated* was treated as poorly as [Plaintiff]") (emphasis added).  Plaintiff merely makes conclusory statements, such as "Black women were expected to accept worse treatment," "men were required to take less training and permitted to make threats," and "non-disabled people did not have [to] fight for their safety and could rely on well-run investigations." (*Id.*)  But Plaintiff identifies no evidence in the record that supports these bare contentions.

The result is the same if the Court applies the direct evidence test.  Plaintiff has put forth no evidence that RI acted with a discriminatory motive, nor that the alleged discrimination she

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 13

suffered either in her interactions with Jane, Simmons, or Giles was a "significant or substantial factor" in her termination or any other adverse action. *Alonso*, 315 P.3d at 616. Plaintiff testified feeling "uncomfortable" working with Jane because she believed Jane held "[u]nderlying racial bias," but there is no evidence to suggest this situation played into her termination at all. (Dkt. No. 47-31 at 6.) Plaintiff has similarly failed to present evidence to show that her conversation with Simmons about race in the workplace was discriminatory in some way; it appears Plaintiff at most identified a perceived slight, but she does not identify any specific act of discrimination. (*Id.* at 6, 34.) Importantly, "not everything that makes an employee unhappy is an actionable adverse action." *Alonso*, 315 P.3d at 747; *compare Kirby v. City of Tacoma*, 98 P.3d 827, 837 (Wash. Ct. App. 2004) ("insults, indignities, threats, annoyances, petty oppressions or other trivialities" are not adverse employment actions) *with Bell v. Boeing Co.*, 599 F. Supp. 3d 1052, 1076 (W.D. Wash. 2022) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (adverse actions must amount to a "significant change in employment status," such as "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits")).

The same shortcomings apply to Plaintiff's disagreement with Giles. Plaintiff asserts in her opposition brief that Giles had "demonstrated that he was sexist towards women" (*see* Dkt. No. 48 at 16), but Plaintiff concedes the dispute was related to Plaintiff's "credentials and schooling" rather than her gender. (Dkt. Nos. 39-2 at 16; 39-5 at 2.) Looking at the record as a whole, Plaintiff cannot establish a causal connection between her termination and any circumstances or conduct that would raise a "reasonable inference of unlawful discrimination." *Marin v. King Cnty.*, 378 P.3d 203, 212 (Wash. Ct. App. 2016). Plaintiff therefore fails to make a prima facie claim based on direct evidence as well.

As a final note, even if Plaintiff made a prima facie showing of disparate treatment, she fails to show RI's reasons for terminating her employment were pretextual.  She argues "[t]he *only* reason proffered by RI for terminating [Plaintiff] is that it claims she did not return from leave, even though it admits she was never directed to return and [was] actually told she could not return on October 1, 2023."[8]  (Dkt. No. 48 at 18.)  It is not clear to the Court how this argument demonstrates pretext.  In any case, it is Plaintiff's burden to prove that discrimination was a substantial factor in her termination, *see Scrivener*, 334 P.3d at 447, and Plaintiff has failed to do so.  The record establishes RI's employment decisions were not motivated by Plaintiff's race, gender, or alleged disability, but instead by her failure to return to work on October 1 as she identified, and her failure to communicate for several days afterward.  (*See* Dkt. Nos. 47-31 at 25; 47-33 at 125–129, 131.)  Plaintiff has failed to put forth anything more than conclusory statements to support her prima facie case.  (*See* Dkt. No. 48 at 16.)  Summary judgment is thus warranted on Plaintiff's disparate treatment claim.

### b.  Hostile Work Environment

"To establish a prima facie hostile work environment claim under WLAD, a plaintiff must show the following four elements: '(1) the harassment was unwelcome, (2) the harassment

---

[8] Plaintiff provides an inaccurate record citation in support of this statement. The page she cites primarily includes a back-and-forth between counsel regarding a break during Wolfgram's deposition. (*See* Dkt. No. 47-32 at 149.)  Nowhere on that page does it say that RI admitted Plaintiff was "never directed to return," nor that Plaintiff was "actually told" she could not return on October 1. (*See id.*)  Wolfgram did testify a few questions before this exchange that Plaintiff "needed to be cleared to return to work" in order to discuss the outcome of the investigation and confirmed that RI did not tell Plaintiff the results of the investigation before she submitted a doctor's note. (*Id.* at 148.)  Notwithstanding Plaintiff's mischaracterization of the record, it is unclear how Wolfgram's testimony illustrates a failure to disprove pretext, and it is not the Court's job to dig through Plaintiff's 500+ page declaration to find if, whether, or by whom these comments were in fact made. *See Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (citation omitted).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 15

was because [plaintiff was a member of a protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.'"

*Loeffelholz v. Univ. of Wash.*, 285 P.3d 854, 859 (Wash. 2012) (en banc) (citation omitted). Harassment is only actionable if it is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Alonso*, 315 P.3d at 618. Courts must look at the totality of the circumstances and consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Brooks-Joseph*, 697 F. Supp. 3d at 1093 (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005)).[9]  However, the work environment must be both "subjectively and objectively hostile," meaning the plaintiff must show they believed the work environment to be hostile *and* that a reasonable person would perceive the same. *Dominguez-Curry*, 424 F.3d at 1034.

As with Plaintiff's disparate treatment claim, there is no dispute Plaintiff belongs to a protected class. Nor do the Parties dispute that Plaintiff did not welcome any hostility or harassment. In her deposition, Plaintiff testified that Jane, her white colleague, engaged in "'subliminal racism'" when she falsely reported to a supervisor that Plaintiff was yelling at her. (Dkt. No. 39-1 at 3.)  When Plaintiff brought this concern to Simmons, she was told, "[U]nfortunately, these are the types of things that we [as Black women] have to go through." (Dkt. No. 47-31 at 34.)  It is unclear from Plaintiff's deposition testimony whether she believed the conversation with Simmons *itself* constituted racism, or if she took offense to the proposition

---

[9] Although this case only involves discrimination claims under the WLAD, Washington courts often look to federal Title VII case law "as a source of guidance" when interpreting the WLAD. *Blackburn v. State*, 375 P.3d 1076, 1080 (Wash. 2015) (en banc) (citation omitted).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 16

that a supervisor believed she might have to endure uncomfortable treatment as part of her job: "I wouldn't use [the words 'racial discrimination'] verbatim[] . . . But to basically state that the things I'm going through, even though I'm racially profiled, racially attacked, making, you know – to be able to say – to endure like this you've been doing, that's a form of racism."  (*Id*. at 34.)

Either way, Plaintiff's position that this amounts to hostile work environment discrimination is unsupported by the record.  *See Talley v. Seattle Pub. Schs.*, No. 80934-2-I, 2021 WL 1695308, at *5 (Wash. Ct. App. Apr. 26, 2021) (affirming summary judgment to the employer on hostile work environment claim when the plaintiff claimed a supervisor's accusations of cursing were racially motivated because "'white people in general think that's what black women do when they get upset'").  There is no indication this single discussion implicating race was significant enough to alter the terms or conditions of Plaintiff's employment.  Plaintiff testified she was "uncomfortable" about the situation, but felt "reassured" after speaking with Simmons, who told Plaintiff not to worry about Jane's allegations, because Simmons "knew [Plaintiff's] character."  (Dkt. No. 47-31 at 6.)  Nor does the record indicate Jane posed a recurring issue during Plaintiff's employment.  *See Brooks-Joseph*, 697 F. Supp. 3d at 1103 (citation omitted) (citing Supreme Court precedent and emphasizing that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment").  Plaintiff testified only that RI management could have "done a little more as far as making sure that my feelings [were] being considered, as well as making sure that I felt safe[.]"  (Dkt. No. 47-31 at 6.)  She was unable to identify any other instances of racism she experienced while working at RI.  (*See id.* at 34.)

Neither can Plaintiff establish hostile work environment discrimination via her disagreement with Giles.  She argues without citation to the record that Giles "had already

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 17

demonstrated he was sexist towards women" when he yelled at Plaintiff.  (Dkt. No. 48 at 17.)  But when asked in deposition if the June 28 incident was premised on her race, gender, or disability, Plaintiff responded, "I'm unsure"; she clarified Giles told her she did not "have the room to talk . . . due to, you know, my age as well as my credentials and schooling."  (Dkt. No. 39-2 at 16; *see also* Dkt. No. 47-31 at 43 ("I wouldn't say [he was discriminating against me] because of my race.  I would say my educational background.").)  Plaintiff's contemporaneous report to RI management likewise did not mention gender or race.  (*See* Dkt. No. 39-5 at 2–3.)  Rather, she described Giles "speaking down [] at [her]" and using a "belligerent" tone.  (*Id.*)  Later testimony indicates Plaintiff's concerns with Giles stemmed from his aggressive outburst rather than a discriminatory motive: "[W]hen . . . he would slam his hand at the desk I was sitting [at], pointing at my face, yelling at me is what made me feel more that I was in a hostile work environment."  (Dkt. No. 47-31 at 16.)  While Giles's conduct was by no means appropriate, it appears to have been an isolated incident unrelated to any of Plaintiff's protected characteristics.  *See Knutson v. Wenatchee Sch. Dist. #246*, No. 32540–7–III, 2015 WL 4456245, at *18 (Wash. Ct. App. July 21, 2015) (affirming summary judgment on a hostile work environment claim when a supervisor's "aloofness, rudeness, and occasional yelling" caused the plaintiff "discomfort" and concluding the conduct was "more akin to the ordinary tribulations of the workplace rather than extreme conduct that is actionable").

As Washington courts have cautioned, the WLAD "is not intended as a general civility code." *Alonso*, 315 P.3d at 747.  While Plaintiff has identified workplace incidents that made her feel uncomfortable and belittled (*see* Dkt. No. 47-31 at 6, 43), she has not met her burden to produce specific and material facts to overcome summary judgment on her hostile work environment claim.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 18

## 2. Failure to Accommodate

Plaintiff's complaint does not specify whether she is bringing her failure to accommodate claim under the ADA, WLAD, or both. (*See* Dkt. No. 1-1 at 6–7.) To allege a prima facie case for failure to reasonably accommodate a disability under either the ADA or WLAD, the plaintiff must show:

> (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality.

*Davis v. Microsoft Corp.*, 70 P.3d 126, 131 (Wash. 2003) (en banc) (emphasis omitted) (citation omitted); *Austin v. Boeing Co.*, Case No. C12–623 MJP, 2013 WL 230824 (W.D. Wash. Jan. 22, 2013) ("The failure to accommodate claim under WLAD follows the same analysis as the ADA's failure to accommodate claim."). An employer's duty to accommodate an employee's disability does not arise until the employer is aware of the disability and the employee's limitations. *Gamble v. City of Seattle*, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018) (citation omitted). Summary judgment is proper if the plaintiff fails to raise a genuine issue of fact on one or more of the prima facie elements. *Id.* (citation omitted); *see also Wilson v. Wenatchee Sch. Dist.*, 40 P.3d 686, 689 (Wash. Ct. App. 2002) (citing *Christiano v. Spokane Cnty. Health Dist.*, 969 P.2d 1078, 1080–1081 (Wash. Ct. App. 1998) ("[b]ecause the reasonable accommodation inquiry is dispositive," a failure to accommodate claim may be decided on that issue alone)).

Plaintiff's failure to accommodate claim fails because, critically, "there is no duty under WLAD to reasonably accommodate an employee's disability by providing her with a new supervisor." *Snyder v. Med. Serv. Corp. of E. Wash.*, 35 P.3d 1158, 1163 (Wash. 2001) (en

banc).  In *Wilson*, the Washington Court of Appeals applied *Snyder* and affirmed summary judgment for the employer on a failure to accommodate claim when an employee was diagnosed with "generalized anxiety disorder" related to the conditions of his work supervision, and the employee requested a transfer away from his supervisor as an accommodation after he took an extended leave of absence.  40 P.3d at 687, 689; *see also Snyder*, 35 P.3d at 1162–1163 ("if [the plaintiff] can perform the job, then she has no disability requiring accommodation simply because she has a personality conflict with her supervisor"); *Hahn v. City of Tacoma*, No. 32622–1–II, 2006 WL 1233891, at *10 (Wash. Ct. App. May 9, 2006) (affirming summary judgment for the employer when the plaintiff's request for an accommodation was "clearly grounded on his desire to avoid working under [his supervisor]").

Here, Plaintiff explicitly maintains her "Adjustment Disorder and Anxiety" (*see* Dkt. No. 1-1 at 3) was caused by her conflict with Giles on June 28, 2023.[10]  (Dkt. Nos. 39-6 at 3; 47-31 at 43.)  And while Plaintiff did not specifically request a new supervisor as a condition of her return from leave, she testified she "would have asked not [to] be placed on the same schedule" as Giles, and that if RI did not change her schedule, she did not think she would have returned to work.  (Dkt. No. 47-31 at 16; *see also id.* at 25 (explaining that she was not going to return to work until she "[got] a safe workplace resolution").)  The evidence does not indicate Plaintiff ever communicated these precise thoughts to RI in the form of an accommodation request, but either way, a request for a new supervisor or a schedule change to avoid interacting with Giles is

---

[10] Though the Parties dispute whether Plaintiff's "Adjustment Disorder and Anxiety" is a qualifying disability or impairment as defined by the WLAD (*see* Dkt. Nos. 39 at 13 n.17; 48 at 20), the Court assumes for purposes of the analysis that Plaintiff is disabled under the statute yet concludes she still cannot satisfy all four elements of her prima facie case.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 20

not a reasonable request as a matter of law. *See Snyder*, 35 P.3d at 1163. Summary judgment is therefore proper on Plaintiff's failure to accommodate claim.

### 3. WLAD Retaliation

The WLAD also prohibits employers from retaliating against employees who "oppose discriminatory practices prohibited by the act." *Bittner*, 558 P.3d at 187; *see also* Wash. Rev. Code § 49.60.210(1). A WLAD retaliation claim has three elements: "(1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018) (en banc). Protected activities include opposing employment practices forbidden by antidiscrimination law or other practices the plaintiff "reasonably believed to be discriminatory." *Alonso*, 315 P.3d at 620. A plaintiff can either prove retaliation via the *McDonnell Douglas* framework, *see* n.7 *supra*, or the direct evidence test, in which the employee must produce "direct evidence that the defendant acted with a discriminatory motive and that the discriminatory motivation was a significant or substantial factor in an employment decision." *Bittner*, 558 P.3d at 187 (citation and quotations omitted). If the employee makes this showing, the employer must show by a preponderance that the same decision would have been made "'absent the discriminatory factor.'" *Id.* (citation omitted).

Plaintiff cannot survive summary judgment on her WLAD retaliation claim. First, as already discussed, Plaintiff's report regarding her disagreement with Giles did not implicate race, gender, or disability. (*See* Dkt. No. 39-5 at 2–3.) Without more, this report cannot be the basis of a WLAD retaliation claim, because "[a] general complaint about an employer's unfair conduct

does not rise to the level of protected activity in a discrimination action under WLAD absent some reference to the plaintiff's protected status." *Alonso*, 315 P.3d at 620–621.

Second, while Plaintiff did report Jane's "'subliminal racism'" to Simmons (*see* Dkt. No. 39-1 at 3), there is no evidence of any causal connection between that incident and any adverse action suffered by Plaintiff—or that Wolfgram, who terminated Plaintiff, was even aware of Plaintiff's report. (Dkt. No. 39-11 at 3); s*ee Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (to prevail on a Title VII retaliation claim, the plaintiff must present evidence that the actor who took the adverse employment action knew the plaintiff engaged in protected activity). Plaintiff also testified she received no discipline as a result of talking to Simmons about Jane's allegedly false allegations. (Dkt. No. 47-31 at 6.)

Finally, to the extent Plaintiff's WLAD retaliation claim is premised on the fact she took leave or "sought [PMFL] while on leave" (Dkt. No. 48 at 21), there is similarly no evidence of a causal connection between these actions and her termination. Plaintiff argues, in conclusory fashion, that "she was told she could not return from leave and then terminated when she listened to her employer" and "she was terminated while on mental health leave and awaiting a doctors [sic] appointment because Rochelle Williams[11] wanted to terminate her – motivated by the fact [that Plaintiff] had taken mental health leave." (Dkt. No. 48 at 21.) Plaintiff does not cite to a single piece of evidence in the record that supports these contentions. Nor does she meaningfully dispute Defendants' evidence that shows RI was prepared to welcome Plaintiff back from leave and only terminated her after she failed to show up or communicate about her return for five days. (*See* Dkt. Nos. 39-9 at 2–3; 39-11 at 3; 47-31 at 25; 47-33 at 125–129, 131.) "When opposing parties tell two different stories, one of which is blatantly contradicted by the

---

[11] Rochelle Williams was RI's HR Director during the relevant time. (*See* Dkt. No. 47-33 at 77.)

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 22

record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Further, although there is a factual dispute about which party was to blame for the *reason* Defendants were never made aware Plaintiff was receiving PFML payments (*see* Dkt. Nos. 47-31 at 13, 18–19, 37; 47-32 at 157–158; 47-34 at 2), Plaintiff also has not attempted to rebut Defendants' evidence that it never knew Plaintiff's benefits had been approved and that she was officially receiving payments from the state while on leave. (Dkt. Nos. 37 at 18–19; 48 at 21; 51 at 9.) An employer's knowledge of an employee's protected activity is necessary for the causation element of a prima facie retaliation case. *Raad*, 323 F.3d at 1197. Plaintiff's failure to put forth evidence of a causal link between her taking leave or applying for PFML benefits and her ultimate termination is fatal to her WLAD retaliation claim.

### 4. FMLA and PFML Retaliation[12]

A FMLA interference claim requires the plaintiff show "(1) [she] was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [she] was entitled to leave under the FMLA, (4) [she] provided sufficient notice of his intent to take leave, and (5) [her] is employer denied [her] FMLA benefits to which he was entitled." *Crawford v. JP Morgan Chase*, 983 F. Supp. 2d 1264, 1270 (W.D. Wash. 2013) (quoting *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011)). The PFML "mirrors its federal counterpart" and

---

[12] While Plaintiff styles her fourth cause of action as "FMLA and PMLA Retaliation" (*see* Dkt. No. 1-1 at 7), Defendants correctly note that Plaintiff's claims are, in reality, interference claims. (*See* Dkt. No. 37 at 17.) The Ninth Circuit has applied the FMLA interference section where a plaintiff has mistakenly alleged retaliation when the complaint, facts, and briefing indicated the plaintiff intended to bring an interference claim; this Court will do the same. *See Rexwinkel v. Parsons*, 162 Fed. App'x 698, 700 (9th Cir. 2006).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 23

courts "construe its provisions in a manner consistent with similar provisions of the FMLA." *Crawford*, 983 F. Supp. 2d at 1269.

As a preliminary matter, Plaintiff cannot establish she was eligible for FMLA benefits in June 2023, nor that she ever requested FMLA benefits or was told by RI that she was eligible for FMLA leave. (Dkt. No. 47-31 at 13, 36–37) (expressing confusion in her deposition about what type of leave she was eligible for and stating she was "not sure" if she had received FMLA leave or something else). RI likewise did not consider Plaintiff to be on FMLA leave. (Dkt. No. 47-32 at 159.)

Further, Plaintiff cannot identify any actions RI took that interfered with her leave. Plaintiff's opposition to Defendants' motion for summary judgment boils down to a few conclusory statements: She "sought [PFML] while on leave" and then was terminated while on leave. (Dkt. No. 48 at 21.) As with many of her other claims, Plaintiff does not cite to any evidence in support of these bare assertions. "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Moreover, the record shows Plaintiff received the entire period of leave she requested (*see* Dkt. 39-6 at 3; 47-32 at 158–159) (Plaintiff requested leave from June 28 to September 28 and both parties anticipated Plaintiff would return on October 1) and was set to return on a date that she herself determined (*see* Dkt. No. 47-33 at 121). Plaintiff indisputably never provided documentation of her PFML benefits after RI's request on September 27. (Dkt. No. 47-33 at 109–110, 121–124.) It appears RI only took an adverse action against Plaintiff once she failed to return to work or communicate about her return—independent of any protected leave. (Dkt. No. 47-33 at 127–129.) Her FMLA and PFML retaliation claims thus fail.

### 5. Whistleblower Retaliation

Plaintiff failed to meaningfully address Defendants' arguments attacking her claims of whistleblower retaliation. (*See* Dkt. No. 48 at 21.) Her opposition brief does not identify how any of the laundry list of actions she took involve reporting an activity to her employer that would "contravene a clear mandate of public policy," nor how any of her conduct, however tangentially linked to a public policy concern, was a "significant factor" in her termination. (*Id.*); *Martin v. Gonzaga Univ.*, 425 P.3d 837, 844 (Wash. 2018) (en banc) (citation omitted). The Court is not required to connect the dots on Plaintiff's behalf. *E.g.*, *Carr v. City of Springfield*, Case No. 6:21-cv-01402-MC, 2024 WL 4492775, at *3 (D. Or. Oct. 15, 2024) ("It is not the Court's duty to make Plaintiff's arguments for her."). Defendants are entitled to summary judgment on Plaintiff's fifth cause of action.

### 6. Wage Theft

Plaintiff explicitly abandoned her wage theft claim. (Dkt. No. 48 at 22.) Summary judgment is thus granted on Plaintiff's sixth cause of action.

### 7. Unlawful Discharge

The common law tort of wrongful discharge is a "narrow exception" to the at-will employment doctrine. *Billings v. Town of Steilacoom*, 408 P.3d 1123, 1137–1138 (Wash. Ct. App. 2017) (citation omitted). It is intended to balance the "'employee's interest in job security [against] the employer's interest in making personnel decisions without fear of liability.'" *Id.* at 1138 (citation omitted). However, the exception should be "narrowly drawn so that it does not swallow the general rule of at-will employment." *Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 257 P.3d 586, 595 (Wash. 2011) (en banc). Though there are four factual scenarios that may generally give rise to an unlawful discharge claim, Plaintiff appears to argue only that her

discharge was "in violation of public policy."[13]  (Dkt. No. 48 at 21.)  That claim requires Plaintiff to establish the following elements: (1) the existence of a clear public policy; (2) discouraging the conduct in which she engaged would jeopardize the public policy; (3) the public-policy-linked conduct caused the dismissal; and (4) the defendant must not be able to offer an "overriding justification" for the dismissal.  *Billings*, 408 P.3d at 1138 (citation omitted).

Plaintiff's framing of her unlawful discharge claim is anything but narrowly drawn.  She vaguely asserts that Washington has a "clear policy against discrimination," and that RI's actions "discourage employees to report racism, take mental health leave, or apply for [PFML]."  (Dkt. No. 48 at 22.)  But Plaintiff does not point to *a single fact* from the record that establishes a causal connection between her termination and any public policy-related conduct.  (*Id.*)  In her deposition, she vaguely attributed her termination to "speaking up for [her] client being mistreated" and "just speaking up in general regarding the unfair treatment that [she] was receiving," but she could not identify any public policies that RI's conduct violated.  (Dkt. No. 39-1 at 6, 14.)  Further, Plaintiff has not put forth evidence to contravene Defendants' "overriding justification" for Plaintiff's termination: that she did not return to work on October 1, 2023, as she told RI she would, and she failed to communicate with RI in any way from September 29 through October 5.  (*See* Dkt. Nos. 47-31 at 25; 47-33 at 125–129, 131); *Billings*, 408 P.3d at 1138 (citation omitted).  Plaintiff's unlawful discharge claim therefore fails.

---

[13] The other three situations are where (1) employees are fired for refusing to commit an illegal act; (2) employees are fired for performing a public duty, such as jury duty; and (3) employees are fired for exercising a legal right, such as filing a workers' compensation claim.  *TeleTech*, 257 P.3d at 595 (citation omitted).  Plaintiff does not allege—and the record does not indicate—that any of these situations apply to this case.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 26

**IV    CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment (Dkt. No. 37) is GRANTED.  Defendants' motion to exclude the expert testimony of Tyson Bailey and Luke Fischer (Dkt. No. 35) is DENIED as moot.  The trial calendar is stricken, and the Clerk shall close the case and enter judgment.


Dated this 20th day of January 2026.

David G. Estudillo
United States District Judge

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 37) - 27