UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TYAJAH WILLIAMS,

                    Plaintiff,

          v.

RECOVERY INNOVATIONS INC et al.,

                    Defendants.

CASE NO. 3:24-cv-05496-DGE

ORDER ON MOTION TO AMEND
JUDGMENT (DKT. NO. 59)

## I    INTRODUCTION

Before the Court is Plaintiff's motion to amend judgment pursuant Federal Rule of Civil Procedure 59(e) or in the alternative, for relief from judgment pursuant to Rule 60(b).  (Dkt. No. 59.)  Defendants Recovery Innovations Inc. ("RI") and Michael Giles (collectively, "Defendants") oppose the motion.  For the reasons that follow, Plaintiff's motion is GRANTED in part and DENIED in part.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 1

## II    FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural History of Plaintiff's Rule 59(e) Motion

On January 20, 2026, the Court granted Defendants' motion for summary judgment and entered a judgment dismissing all of Plaintiff's claims with prejudice. (Dkt. Nos. 56, 57.) On February 17, Plaintiff filed her motion to amend. (Dkt. No. 59.) The Court ordered Defendants to respond and outlined a briefing schedule for the instant motion. (Dkt. No. 61.)

Plaintiff argues the Court incorrectly concluded she had failed to provide evidence RI prohibited her from returning to work on October 1, 2023. (Dkt. No. 59 at 8.) She identifies three errors the Court made in coming to this conclusion: (1) it conflated and combined two correct citations, "leading it to ignore key evidence"; (2) it ignored key evidence that RI prohibited Plaintiff from returning to work on October 1; and (3) it ignored examples of pretext related to communications surrounding Plaintiff's return-to-work and whether RI had in fact instructed her not to return on October 1. (*Id.*) Plaintiff further argues that the exclusion of key facts from the Court's order also led it to incorrectly grant summary judgment on several other claims, including those for disparate treatment discrimination, hostile work environment, failure to accommodate, retaliation in violation of the Washington Law Against Discrimination ("WLAD"), and unlawful discharge. (*Id.* at 12–15.)

In their response, Defendants posit that Plaintiff's Rule 59(e) motion is a "recast motion for reconsideration" that goes further than addressing the Court's footnote error. (Dkt. No. 62 at 2.) Defendants argue Plaintiff has not pointed to any "manifest errors" that would warrant reconsideration under Rule 59(e) on any of her employment claims. (*Id.* at 4–6.) In reply, Plaintiff reiterates her position that the footnote error "affected the core analysis" of several of her causes of action, and further, that any disputes about the credibility of deposition testimony

or other facts should be construed in her favor.  (Dkt. No. 64 at 2–5.)  The Court held a hearing on the motion on April 30, 2026.  The matter is now ripe for disposition.

**B.  Summary of Relevant Facts**

The Court refers to its order on the motion for summary judgment for a full recitation of the facts underlying this lawsuit.  (*See* Dkt. No. 56 at 1–8.)

**1.  RI's Ten-Day Notice Policy**

As of July 2023, RI was using a ten-day notice policy, where it would provide employees who were out on leave with an intent-to-return email ten days before their scheduled return date.  (Dkt. No. 47-33 at 21–23, 42.)  Under the policy RI would email employees ten days prior to the "known date of an employee's end date for their leave" and inform them of the required documents for the employee to return, including a fitness for duty form regarding any accommodations.  (*Id.* at 42.)  Lead Benefit Specialist McKenna Haig testified RI defined the "known date" for the end of an employee's leave based on the approved end date for their "medical certification or ADA paperwork."  (*Id.* at 42–43.)

However, Haig testified the ten-day notice policy does not apply in situations where an employee's return date is unknown.  (*Id.* at 95) ("We can't -- we reach out with a ten-day notice when we are aware of the exact date that somebody is expected to return.  The ten day -- the ten days can't be provided if we're not aware of that date.").  In those situations, RI would send the intent-to-return email with fewer than ten days' notice.  (*Id.* at 23.)  Critically, the ten-day policy does not extend a return date; an extension on the return date would only be considered if before the return date, the employee communicated with RI about needing additional time.  (*Id.* at 94 ("[A]s long as [the employee] provided us enough information for us to see that it is due to circumstances outside of their control . . . we are willing and able to wait and extend out their

leave."); 126–127 (That ten-day policy that we have is not typically to extend a leave date.  It is to provide ten days before [the employee's] end date in order to allow them to schedule whatever they may possibly need to schedule.").)  Haig emphasized in deposition that an employee requesting additional time to return paperwork needed to show "a consistent intent to return to work" and to "communicate with us, if they are expected to return on a certain day, when we can expect that documentation so that we can approve an extension."  (*Id.* at 95, 98.)

### 2.  Timeline of Plaintiff's Return to Work

RI has no record of an official return-to-work date ever identified at the time Plaintiff went on leave.  In her deposition, Haig clarified that on July 7, 2023, RI received "a copy of the form that would be sent to Washington."  (*Id.* at 85.)  The record indicates on July 6, 2023, Plaintiff emailed a Washington Paid Family Medical Leave ("PFML") "Medical Certification Serious Health Condition" form to Melissa Greaig, a Senior HR Generalist, requesting leave from June 28 through September 28.  (Dkt. No. 39-6 at 2–3.)  The description of the serious health condition read, "High conflict w/ Supervisor . . . resulting in Adjustment disorder w/ Anxious mood." (*Id.* at 3.)  Haig confirmed RI had received this "original notice that the actual [leave benefits] request had been submitted[,]" but the company never received documentation from the state confirming Plaintiff's benefits had been approved.  (Dkt. No. 47-33 at 86.)  This meant, according to RI, that Plaintiff was on "an unapproved pending leave status[,]" because RI was aware of her leave request, but had not been able to verify or approve the leave request. (*Id.*)  As discussed in more depth in the order on summary judgment (*see* Dkt. No. 56 at 5), there are questions about *why* RI was never made aware Plaintiff was approved for PFML by Washington, but the evidence indicates the entire time Plaintiff was on leave, RI was waiting for confirmation of her leave status from the state.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 4

September 26

Plaintiff reached out to RI on September 26, 2023, by emailing Program Supervisor Wendy Milton.[1]  (Dkt. No. 44 at 23–24.)  Plaintiff wrote, "I am reaching out today to verify my employment status with [RI].  It was my understanding that my return-to-work date was Oct 1, 2023.  Thank you in advance for your timely [] reply for the above given matter."  (*Id.* at 24.)  Milton told Plaintiff to "follow up with [the] benefits department as it has not been clearly communicated a return date."  (*Id.* at 23.)  Plaintiff asked Milton to assist with getting her in touch with Benefits and clarified she was still employed but "you have not received an update of my date of return."  (*Id.*)  Milton advised Plaintiff someone from Benefits would be reaching out to her.  (*Id.*)  In her deposition, Haig confirmed that as of September 26, "[n]obody at RI International had her return-to-work date" because they had not received Plaintiff's PFML approval letter and therefore did not know the official dates of Plaintiff's leave.  (Dkt. No. 47-33 at 85, 90–91.)  The evidence indicates September 26 was the first time Plaintiff's return date was identified.

September 27

Plaintiff states on September 27 she attempted to contact her program supervisor "via telephone and email to confirm her employment status."  (Dkt. No. 44 at 4.)  She further states when she was contacted by email, her program supervisor "refused to confirm [her] employment status."  (*Id.* at 5.)  The only documented email from someone at RI to Plaintiff on September 27 is an email from Haig to Plaintiff's personal email with next steps to facilitate Plaintiff's return.[2]

---

[1] Plaintiff sent an email to RI on September 13, 2023 that states her return is "rapidly approaching" but does not include a return date.  (*See* Dkt. No. 47-31 at 74.)

[2] Breanne Wolfgram, RI's corporate representative, testified that when someone was on leave, RI "normally send[s] communication[s] to their personal email."  (Dkt. No. 47-32 at 155.)

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 5

(Dkt. No. 47-31 at 80–81.) The email requested (1) a return-to-work form completed by Plaintiff's attending physician and (2) a "WA FMLA Approval Letter": "If you utilized Washington State Family and Medical Leave Act (WA FMLA) during your time off, please provide us with a copy of the approval letter or documentation to confirm that your leave was approved." (*Id.* at 81.) Haig wrote to Plaintiff, "[o]nce we receive these documents, we can work together to plan your return to work in a way that accommodates any necessary adjustments or accommodations, if applicable." (*Id.*) Haig acknowledged in deposition that someone who received this email could reasonably assume they could not return to work until they completed both forms. (Dkt. No. 47-33 at 122–123.)

September 29

Plaintiff emailed RI on September 29 from her work email. (Dkt. No. 44 at 28.) She said she was "mentally ready and excited to continue with [her] position as a Milieu Specialist" at RI and inquired again "regarding the company's return policy and whom to follow up with regarding situations of return." (*Id.*) She requested someone reach out to "confirm employment status and with necessary conversations regarding me returning to work[.]" (*Id.*) Haig responded and forwarded the email she sent Plaintiff on September 27 which requested the return-to-work form and WA FMLA Approval Letter. (*Id.* at 27.) Plaintiff responded, asking again about the "investigation that [she] was involved in" and requesting that someone provide a copy of the investigation findings. (*Id.*) She did not acknowledge RI's request for Plaintiff to submit the return-to-work form or the PFML approval letter. (*Id.*) There is no evidence in the record that Plaintiff sent RI a PFML approval letter.

At some point around September 29, Plaintiff apparently scheduled a doctor's appointment, but it is unclear when exactly, and the record suggests she did not tell RI about the

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 6

appointment at this point.  Plaintiff states in her declaration she "promptly scheduled an appointment with [her] doctor," but there was no availability before October 1.  (Dkt. No. 44 at 5.)  Haig testified that Plaintiff did not communicate that she had taken steps to complete the return-to-work form by scheduling a doctor's appointment, nor did she request additional time to complete RI's requests.  (Dkt. No. 47-33 at 128–129, 131.)  Plaintiff herself confirmed in deposition she did not communicate with RI between September 29 and October 5, and when asked why she never reached out to RI about scheduling a doctor's appointment, she stated, "I don't know.  There was no reason why.  I just didn't." (Dkt. No. 47-31 at 25.)  Her belief was that because RI told her she could not work until receiving her return-to-work form, she was not scheduled to work on October 1.  (Dkt. No. 44 at 5.)

October 5

Wolfgram emailed Plaintiff on October 5 to "formally address [her] failure to return to work following [her] approved leave of absence[.]"  (Dkt. No. 39-11 at 3.)  Wolfgram noted Plaintiff had failed to return to work and pointed to Plaintiff's "extended absence without prior notice or communication" as evidence of Plaintiff's resignation.  Wolfgram wrote, "[y]our employment at RI International is terminated as of 10/5/2023." (*Id.*)  Plaintiff responded less than an hour later stating she had "no knowledge of any communication regarding return from leave from the HR Department that I have not responded to[.]" (*Id.* at 2.)  She requested her personnel file and complained she had received "little to no communication" from HR during her leave but still did not address the return-to-work form, PFML approval letter, or other requirements Haig had identified.  (*Id.*)  Plaintiff then emailed Wolfgram a second time and finally confirmed her receipt of the return-to-work form and informed Wolfgram the "soonest

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 7

availability" her doctor could see her was October 27. (*Id.*) Wolfgram responded that RI was "unable to continue employment based on the failure to return." (Dkt. No. 44 at 30.)

### 3. Jennifer Goodwin

Plaintiff identifies a white RI employee named Jennifer Goodwin whom Plaintiff believes received the benefit of RI's ten-day notice policy when Plaintiff did not. Goodwin was a registered nurse in Arizona who went on pregnancy leave in 2025 and had a known return date of July 20, 2025. (Dkt. Nos. 38 at 2; 47-33 at 104–105.) Haig testified she sent Goodwin the return-to-work email on July 10, ten days prior to Goodwin's return date, in alignment with RI's policy. (*Id.* at 102, 105.) Haig did not hear from Goodwin until Goodwin reached out on July 18, two days before her scheduled return-to-work date, explaining her belief that her doctor was in communication with RI. (*Id.* at 105.) Haig advised Goodwin that RI had not heard from Goodwin's doctor and informed her RI needed her paperwork. (*Id.* at 102–103.) Goodwin asked for additional time and gave Haig the date of her new doctor's appointment. (*Id.* at 103.) Haig approved Goodwin's request for more time. (*Id.*)

### III    DISCUSSION

### A. Citation Error

At the hearing, the Court explained it confused Dkt. No. 47-32 at 149 with Plaintiff's citation to Dkt. No. 47-32 at 168.[3] Dkt. No. 47-32 at 149 is "page 168" of the deposition transcript filed at Dkt. No. 47-32. The Court inadvertently attributed *deposition* page 168 of the as Plaintiff's citation, and then used *docket* page 149 of Dkt. No. 47-32 as the Court's citation for page 168 of the deposition. Plaintiff was correct to identify this error.

---

[3] The Court cited Dkt. No. 47-32 at 149 in footnote 8 of the order granting Defendants' motion for summary judgment. (*See* Dkt. No. 56 at 15.) Plaintiff cited Dkt. No. 47-32 at 168 in her response. (*See* Dkt. No. 48 at 18.)

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 8

Because of this error, it is appropriate for the Court to review all issues Plaintiff raises in her present motion, though for the reasons identified herein, the effect of the Court's confusion is less impactful than Plaintiff seeks to characterize.

**B. Legal Standard**

"A motion to alter or amend a judgment is construed under Rule 59(e) if it is filed within 28 days of entry of judgment; otherwise, it is considered under Rule 60(b) as a motion for relief from a judgment or order." *Bonilla v. California*, Case No.: 3:24-cv-00681-JES-KSC, 2024 WL 3043531, at *1 (S.D. Cal. June 18, 2024) (citing *Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892 898–899 (9th Cir. 2001)). Because Plaintiff's motion was filed within this 28-day window (*see* Dkt. Nos. 56, 57, 59), the Court will consider it as a motion brought under Rule 59(e).

Federal Rule of Civil Procedure 59(e) permits a party to file a motion to "alter or amend a judgment[.]" Because "'specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion.'" *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (citation omitted). That said, a Rule 59(e) motion may generally be granted on one of "four basic grounds," though courts are not limited to these situations. *Herron*, 634 F.3d at 1111. Here, Plaintiff lists only two bases for relief: (1) to correct a manifest error of fact upon which the judgment rests and (2) to prevent manifest injustice.[4] (Dkt. No. 59 at 7.) Amending a judgment after its entry is an "'extraordinary remedy which should be used sparingly.'" *Herron*, 634 F.3d at 1111 (citation omitted). It should not be used as an opportunity for a party to get a "'second bite at the apple'

---

[4] The other two grounds identified in *Herron* are (3) if the motion is necessary to present newly discovered or previously unavailable evidence and (4) if the amendment is justified by an intervening change in controlling law. 634 F.3d at 1111.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 9

in order to re-argue an issue already presented to the court or to raise new arguments that could have been raised in the original briefs." *Romo v. City of L.A.*, Case No. CV 23-10864 WDK (PVC), 2024 WL 5227411, at *1 (C.D. Cal. July 9, 2024) (citing *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001)).  Notwithstanding, Rule 59(e) can serve as a "useful function" because it "'permits, if not encourages, a district court to correct its own clear errors.'"  *Id.* (quoting *Kaufman v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022)).

However, as the Court noted during the hearing, because of its confusion the Court is treating Plaintiff's motion as a motion for reconsideration and therefore applying the less onerous standard of Local Civil Rule 7(h)(1), which states motions for reconsideration should be granted only (1) if there is a "showing of manifest error in the prior ruling" or (2) a "showing of new facts or legal authority which could not have been brought to [the court's] attention earlier with reasonable diligence."  *See also Marlyn Natraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) ("[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.").  "Whether or not to grant reconsideration is committed to the sound discretion of the court."  *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 1041, 1046 (9th Cir. 2003).

### C. Analysis

1. **Plaintiff has established a genuine issue of material fact on her claim of unlawful discharge in violation of public policy related to her leave.**

In her motion to amend the judgment, Plaintiff argues the Court erroneously decided many of her claims.  (Dkt. No. 59 at 7–15.)  The Court has reviewed Plaintiff's motion and re-reviewed the record in full and concludes that Plaintiff has shown a genuine issue of material fact

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 10

to overcome summary judgment only on her claim of unlawful discharge in violation of public policy premised on her taking leave.

"Wrongful discharge in violation of a public policy is an intentional tort[]"; it provides a "narrow exception" and courts must "'proceed cautiously.'" *Worley v. Providence Physician Servs. Co.*, 307 P.3d 759, 763 (Wash. Ct. App. 2013) (citation omitted). An unlawful discharge claim is a "tort of last resort," *id.* (citation omitted), though the Washington Supreme Court has cautioned that it "is independent of any underlying contractual agreement or statute" and does not require the employee to exhaust their contractual or administrative remedies before bringing a claim. *Rose v. Anderson Hay & Grain Co.*, 358 P.3d 1139, 1145–1146 (Wash. 2015) (en banc). "Additionally, the [unlawful discharge] tort 'is not designed to protect an employee's purely *private interest* in [their] continued employment; rather, the tort operates to vindicate the *public interest* in prohibiting employers from acting in a manner contrary to fundamental public policy.'" *Paddock v. Port of Tacoma*, 531 P.3d 278, 284 (Wash. Ct. App. 2023) (citation omitted).

To establish a prima facie claim of wrongful discharge in violation of public policy, an employee must show (1) that his or her "'discharge may have been motivated by reasons that contravene a clear mandate of public policy,' and (2) that the public-policy-linked conduct was a significant factor in the decision to discharge the worker." *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 384 (Wash. Ct. App. 2020) (internal citations and quotation marks omitted). There are four scenarios to which Washington courts have generally limited wrongful discharge claims:

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 11

*Martin v. Gonzaga Univ.*, 425 P.3d 837, 843 (Wash. 2018) (en banc) (citation omitted). However, if the employee's case "does not fit neatly within one of these scenarios," *id*. (citing *Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015) (en banc)), courts should apply a four-part framework:

> (1) The plaintiffs must prove the existence of a clear public policy (the clarity element). (2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element). (3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element). (4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element).

*Id*.

Here, Plaintiff appears to argue she was terminated for exercising her right to take leave, which the Court assumes fits within the third scenario outlined in *Martin*.  In her motion, Plaintiff refers only to the FMLA in arguing her unlawful discharge claim should proceed.  (*See* Dkt. No. 59 at 15.)  At oral argument, Plaintiff described three additional public policies: (1) that an employee's disability will be accommodated; (2) that an employer will not discriminate against an employee on the basis of disability or race; and (3) that employers should not be able to trick employees by telling them to do one thing and then terminating them for following that directive.  Though "[w]hat constitutes a clear mandate of public policy . . . can be established by statute[,]" *Mackey*, 459 P.3d at 385, Plaintiff's primary argument seems to be that she invoked protected leave of some kind and was wrongfully terminated for doing so.  The Court finds Plaintiff has not sufficiently raised these three additional bases as "clear mandate[s] of public policy" giving rise to additional wrongful discharge claims.  *Id.* at 384.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 12

However, the Court accepts Plaintiff's claim that the PFML demonstrates "a clear mandate of public policy."[5] (Dkt. No. 59 at 15.) As to the second element, Plaintiff argued in her response to the motion for summary judgment that RI's actions, i.e., terminating her while she was attempting to comply with RI's requirements to return from leave, would "discourage employees to . . . take mental health leave[] or apply for [PFML]." (Dkt. No. 48 at 22.) In support of her claim, Plaintiff points to a Teams conversation between Haig and Rochelle Williams, RI's HR Director during the relevant time, that occurred on October 2, 2023. (*See* Dkt. Nos. 47-33 at 77; 47-34 at 2.) In the message thread, Haig identified that Plaintiff had applied for PFML but Haig "believe[d] it was denied"; Williams responded, "I need you to find out definitely because I don't believe we should be allowing her to return." (Dkt. No. 47-34 at 2.) Plaintiff alleges these messages evidence RI's intention to terminate her because she had sought protected leave benefits and demonstrate RI's end-run around its return-to-work policy. Viewing the facts in the light most favorable to Plaintiff, it was not unreasonable for her to seek leave and/or seek paid leave benefits, and her doing so furthers the policy goal of allowing employees in Washington to seek leave without fear of repercussion. *See Rickman v. Premera Blue Cross*, 358 P.3d 1153, 1158 (Wash. 2015) (en banc) ("[T]he reasonableness of the plaintiff's conduct relates to whether the plaintiff's conduct furthers public policy goals."). Accordingly, although Plaintiff's unlawful discharge claim is not nearly as detailed as one might

---

[5] Though Plaintiff uses FMLA and PFML somewhat interchangeably throughout her briefing, the record indicates Plaintiff was not eligible for FMLA when she took her leave in 2023, because she had not yet been employed by RI for 12 months or worked the requisite number of hours. (Dkt. No. 47-31 at 36–37.) The Court notes the distinction is immaterial to the basic argument that Plaintiff sought leave (whether federal or state) and that she was ultimately discharged for attempting to exercise the right to seek leave.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 13

prefer, the Court concludes it is sufficient to overcome summary judgment.  Plaintiff's motion is therefore GRANTED as to her unlawful discharge claim.

### 2. Plaintiff fails to show there were manifest errors in the Court's analysis on the remainder of her claims.

Even considering the arguments and evidence put forth in Plaintiff's Rule 59(e) motion, the Court concludes Plaintiff has failed to demonstrate there is a genuine issue of material fact on the remainder of her claims.

#### a. WLAD retaliation based on Plaintiff's leave

The WLAD makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against any person because he or she has *opposed* any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter."  Wash. Rev. Code § 49.60.210(1) (emphasis added); *Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018) (en banc) ("WLAD . . . prohibits employers from retaliating against employees who *oppose* discriminatory practices." (emphasis added)); *Bittner v. Symetra Nat'l Life Ins. Co.*, 558 P.3d 177, 187 (Wash. Ct. App. 2024) (same).

Washington requires three elements to establish a WLAD retaliation claim: "(1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action."  *Cornwell*, 430 P.3d at 234 (citing *Currier v. Northland Servs., Inc.*, 332 P.3d 1006, 1011 (Wash. Ct. App. 2014)).  "The first element describes *opposition* to 'any practices forbidden by' Chapter 49.60 [of the Washington Revised Code].  When a person reasonably believes he or she is *opposing* discriminatory practices, [§]49.60.210(1) protects that person whether or not the practice is actually discriminatory."  *Currier*, 332 P.3d at 1011 (footnote omitted) (emphasis added).  Thus, one's opposition to discriminatory practices is key

to a WLAD retaliation claim under § 49.60.210(1).  This conclusion is underscored by the Washington Pattern Jury Instructions: a plaintiff must prove they were opposing what they "reasonably believed to be discrimination on the basis" of a protected status.  WASH. PATTERN JURY INSTRUCTIONS – CIVIL § 330.05, 6A WASH. PRAC. (7th ed. 2022).[6]

Plaintiff fails to establish she was retaliated against for *opposing* discriminatory practices. Plaintiff argues "HR had decided to terminate [Plaintiff] days before they would terminate a white woman contemplating Intent-to-Return, days before they had ever terminated someone for No Call/No Show, and for the express purpose of punishing her for taking mental health leave and seeking FMLA for mental health purposes."  (Dkt. No. 59 at 14.)  Nowhere in this argument is an assertion that Plaintiff was opposing conduct she believed to be discriminatory.  While an employee does not need to show actual discrimination to establish a WLAD retaliation claim, the employee must show they reasonably believed their employer violated the law *and* that they complained about the alleged violation.  *See Ellis v. City of Seattle*, 13 P.3d 1065, 1071 (Wash. 2000) (en banc).  No such evidence is presented in the record.

---

[6] At the hearing, the Court mentioned that the language of the three-part test outlined in *Cornwell* did not actually align with the statutory language requiring a plaintiff show *opposition* to a discriminatory practice, rather than *engaging in* statutorily protected action more broadly. Counsel for Plaintiff acknowledged the law's black letter language but advocated for a liberal construction of the statute that would allow Plaintiff's claim premised on her taking mental health leave to proceed.  As noted, *Cornwell* cites favorably to *Currier* but omits *Currier*'s discussion of the first element, which explicitly requires that a person must reasonably believe they are opposing discriminatory practices in order to meet the first prong of a WLAD retaliation claim.  *See Currier*, 332 P.3d at 1011.  Reading § 49.60.210(1), *Cornwell*, and *Currier* together harmonizes the conflict identified by the Court and solidifies that a successful WLAD retaliation claim requires the plaintiff show they were opposing what they reasonably believe to be discriminatory practice forbidden by Chapter 49.60 of the Washington Revised Code.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 15

b.  Disparate treatment discrimination based on race, with Goodwin as a comparator

Goodwin is not a similarly situated comparator and therefore cannot provide the basis for a disparate treatment discrimination claim.  "Disparate treatment occurs when an employer treats some people less favorably than others because of race, color, religion, sex, or other protected status."  *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 615 (Wash. Ct. App. 2013).  To make a prima facie disparate treatment claim by reference to a comparator, the plaintiff must establish (1) they belong to a protected class; (2) they were treated less favorably in the terms of conditions of their employment (3) than a similarly situated comparator; and (4) the plaintiff and comparator were doing "substantially the same work."  *Johnson v. Dep't of Soc. & Health Servs.*, 907 P.2d 1223, 1231 (Wash. Ct. App. 1996).  If the plaintiff makes the prima facie showing, then the rest of the *McDonnell Douglas* burden shifting framework applies.[7]  *Alonso*, 315 P.3d at 616.

At the hearing, Plaintiff argued she and Goodwin were similarly situated, because they both had intended return dates, both were in communication with RI, and both needed more time to submit their medical documentation, but that she was treated differently from Goodwin because Goodwin "was given up to eight days" to provide the necessary paperwork to return from leave, whereas Plaintiff was "not even given one day[.]"  (Dkt. No. 59 at 12.)  Despite Plaintiff's arguments to the contrary, the Court concludes Plaintiff's prima facie case is insufficient because she cannot show that she and Goodwin were "similarly situated in all

---

[7] Under the first prong of the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Scrivener v. Clark Coll.*, 334 P.3d 541, 546 (Wash. 2014) (en banc).  If the plaintiff makes their prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Id.*  If the defendant meets this burden, the third part of the test requires the plaintiff to produce sufficient evidence that the defendant's nondiscriminatory reason was pretextual.  *Id.* (citation omitted).

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 16

material respects[.]" *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *accord. Johnson*, 907 P.2d at 1232 (analyzing the "similarly situated in all respects" element as it related to the conduct for which the plaintiff and his comparator were disciplined for).

To illustrate, Goodwin is not a proper comparator because she was subject to, and availed herself of, RI's ten-day return-to-work policy, whereas Plaintiff unequivocally did not. As Haig testified, Goodwin had a known return date of July 20, 2025. (Dkt. No. 47-33 at 104–105.) Because Goodwin had a known return date, Haig was able to send the ten-day notice email on July 10 in accordance with RI's policy. (*Id.* at 102.) Goodwin responded on July 18—*before* the ten-day period had run—requesting more time to obtain and submit her medical documentation. (*Id.* at 102–103.) It was only at that point RI agreed to give Goodwin more time to return her paperwork. (*Id.* at 103.)

By contrast, RI never knew Plaintiff's return date because it had never been able to verify her leave approval with the state. (Dkt. No. 47-33 at 85–86.) Accordingly, RI considered Plaintiff to be on "unapproved pending leave status" the entire time she was on leave. (*Id.* at 86.) Though Plaintiff asserts she had an *intended* return date, she acknowledged during oral argument there was never a *known* return date for her leave. So when Plaintiff emailed on September 26, 2023, hoping to verify employment and identifying her plans to return on October 1, this was the first time RI was made aware of any return date. (Dkt. Nos. 44 at 24; 47-33 at 85, 90–91.) RI clearly could not employ its ten-day notice policy, because Plaintiff had provided fewer than ten days' notice before her chosen return date. (*See* Dkt. No. 47-33 at 95) ("The ten day -- the ten days can't be provided if we're not aware of that date.").

Further, as Haig explained, the ten-day notice policy is not an automatic extension of the employee's return date; it is designed to provide an employee time to "schedule whatever they

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 17

may possibly need to schedule." (*Id.* at 126–127.)  In other words, just because RI responded to Plaintiff on September 27 and 29 requesting Plaintiff's medical form and PFML approval (Dkt. Nos. 44 at 27; 47-31 at 80–81), it does not mean Plaintiff was given ten days *from that date* to provide that documentation.  And Plaintiff undisputably did not communicate with RI between September 29 and October 5, only asking for more time *after* her self-identified return-to-work date had passed.  (Dkt. Nos. 39-11 at 2; 47-31 at 25.)  Any claim that Plaintiff was treated differently than Goodwin therefore lacks merit, because they were not similarly situated: they did not "display similar conduct."  *Vasquez v. City of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003).

c.   <u>Disparate treatment based on disability</u>

Plaintiff's disability disparate treatment claim also fails.  To prevail, Plaintiff must make a prima facie case, which requires she show: "(1) she was within a statutorily protected class, (2) she was discharged by the defendant, (3) she was doing satisfactory work, and (4) after her discharge, the position remained open and the employer continued to seek applicants with qualifications similar to the plaintiff."  *Litvack v. Univ. of Wash.*, 546 P.3d 1068, 1078 (Wash. Ct. App. 2024).  If she makes the prima facie case, it creates a rebuttable presumption of discrimination.  *See* n.7 *supra* (*McDonnell Douglas* burden shifting framework).  Plaintiff's claim fails on the first prong because she has not provided sufficient evidence that she was disabled, or perceived to be disabled, within the meaning of the WLAD.  *See* Wash. Rev. Code § 49.60.040(7)(a).  She argues, "[s]he was terminated while on disability leave after she sought FMLA for disability reasons[.]"  (Dkt. No. 59 at 13.)  In her response to Defendants' motion for summary judgment, she provided a PFML Medical Certification Serious Health Condition form, signed by a medical provider, that characterizes her health condition as "High conflict with supervisor . . . resulting in Adjustment disorder w/ Anxious mood."  (Dkt. No. 47-

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 18

31 at 62.)  But this form alone, without supporting medical records or a declaration from a provider or expert, is insufficient to establish that Plaintiff had a "sensory, mental, or physical impairment" to fall within WLAD's definition of disabled.  Wash. Rev. Code § 49.60.040(7)(a).

Further, when Plaintiff reached out to RI on September 29, she expressed she was "mentally ready and excited to continue with [her] position[,]" without mentioning a disability or impairment or any potential accommodations she might need for such a disability.  (Dkt. No. 44 at 28.)  If anything, RI did not perceive Plaintiff to be disabled because it never received documentation approving her leave from the state and accordingly questioned the basis for her leave.  (Dkt. No. 47-33 at 85–86) (Haig explaining Plaintiff was on "unapproved pending leave status" because RI never received confirmation of Plaintiff's leave benefits from the state).  At the hearing, Plaintiff argued the only reason she was on leave was because of a mental health disability, and that she was terminated while attempting to obtain the proper medical documentation to certify this disability—so the only possible explanation for her termination was because of her disability.  But without sufficient evidence that indicates Plaintiff was disabled or that RI perceived her to be disabled when she was returning from leave, Plaintiff cannot establish a prima facie case of disparate treatment based on disability.

### d.   Hostile work environment discrimination

Plaintiff does not create a genuine issue of material fact on her hostile work environment claim and instead relies on conclusory generalizations about her treatment upon her attempt to return to work.  (*See* Dkt. No. 59 at 13) ("The series of events surrounding [her] attempts to return to work constituted a hostile work environment[.]").  "To establish a prima facie hostile work environment claim under WLAD, a plaintiff must show the following four elements: '(1) the harassment was unwelcome, (2) the harassment was because [plaintiff was a member of a

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 19

protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.'" *Loeffelholz v. Univ. of Wash.*, 285 P.3d 854, 859 (Wash. 2012) (en banc) (citation omitted). Harassment is only actionable if it is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Alonso*, 315 P.3d at 618. Courts must look at the totality of the circumstances and consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Brooks-Joseph v. City of Seattle*, 697 F. Supp. 3d 1085, 1093 (W.D. Wash. 2023) (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) (internal citation omitted)). However, the work environment must be both "subjectively and objectively hostile[,]" meaning the plaintiff must show they believed the work environment to be hostile and that a reasonable person would perceive the same. *Dominguez-Curry*, 424 F.3d at 1034.

Here, Plaintiff makes no attempt to point to evidence that shows she was subjected to harassment that was pervasive enough to create an abusive working environment, nor evidence that shows she was subjected to such harassment *because* she is part of a protected class. She merely concludes, without more, "[w]hen such actions [(i.e., terminating Plaintiff after taking leave)] are taken against a Black woman but not her white colleague who is incommunicado for eight days, it is motivated by race as well as disability. When it occurs to punish a person for taking mental health leave, it is motivated by disability discrimination." (Dkt. No. 59 at 13.) At the hearing, she clarified that the hostile work environment was caused by RI denying communication, stonewalling, and tricking Plaintiff into violating the return-to-work policy

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 20

while she was on disability leave.  Such conclusory statements, without evidence, are insufficient to establish a prima facie hostile work environment claim.

> e.    Failure to accommodate

Plaintiff cannot show there is a genuine issue of material fact on her failure to accommodate claim.  She argues the Court misunderstood her accommodation request and asserts she was deprived of two accommodations: (1) information about when she needed to return to work and (2) confirmation that the investigation into Giles "had established she would not be shot when she returned to work."[8]  (Dkt. No. 59 at 14.)

To allege a prima facie case for failure to reasonably accommodate a disability under either the Americans with Disabilities Act ("ADA") or WLAD, the plaintiff must show:

> (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality.

*Davis v. Microsoft Corp.*, 70 P.3d 126, 131 (Wash. 2003) (en banc) (emphasis omitted) (citation omitted); *Austin v. Boeing Co.*, Case No. C12–623 MJP, 2013 WL 230824 (W.D. Wash. Jan. 22, 2013) ("The failure to accommodate claim under WLAD follows the same analysis as the ADA's failure to accommodate claim.").  An employer's duty to accommodate an employee's disability does not arise until the employer is aware of the disability and the employee's

---

[8] This accommodation request comes out of a rumor Plaintiff heard from a former employee, who had been informed by an unnamed "E&T" staff member, that Giles had threatened to "come after" Plaintiff with a gun following their altercation on June 28, 2023.  (Dkt. No. 39-5 at 3.)  In its order on summary judgment, the Court noted this statement was hearsay and likely would be inadmissible at trial.  (*See* Dkt. No. 56 at 4 n.3.)

limitations.  *Gamble v. City of Seattle*, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018) (citation omitted).

As explained in Section III(B)(2)(c) *supra*, Plaintiff has not put forth sufficient evidence to show that her "Adjustment Disorder and Anxiety" (*see* Dkt. No. 1-1 at 3) qualifies as a disability under the WLAD.  Even assuming it did, her failure to accommodate claim fails for two reasons.  First, there is no evidence that Plaintiff gave RI notice of her disability that would give rise to RI's duty to accommodate.  "The duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is 'aware of [the employee's] disability and physical limitations.'"  *Goodman v. Boeing Co.*, 899 P.2d 1265, 1269 (1995) (citation omitted).  "The employee bears the burden of giving the employer notice of the disability."  *Id.* At that point, the employer's "burden to take 'positive steps' to accommodate" the employee kicks in.  *Id.* (citation omitted).

Here, Plaintiff's communication with RI in the lead-up to her return from leave did not make RI "aware of [Plaintiff's] disability and physical limitations."  *Id.* at 1269 (citation and quotation marks omitted).  She inquired three times about her employment status (Dkt. No. 44 at 4, 24, 28) and asked about the investigation into Giles (*id.* at 27), but did not explain to RI what her disability was or how it limited her ability to do her job.  At the hearing, Plaintiff explained she was trying to be a good employee by expressing her excitement about returning but appeared to concede she did not give RI notice of a disability.  Instead, Plaintiff hangs her hat on the fact that she was never given an opportunity to provide medical documentation before she was terminated.  As the Court sees it, there is nothing in the record that indicates RI was notified of a disability that substantially limited Plaintiff at any point while Plaintiff prepared to return to work.  This alone is fatal to Plaintiff's failure to accommodate claim.

Second, the accommodations Plaintiff requests are not proper accommodations, and Plaintiff points to no legal authority to support her position. Washington looks to the ADA in interpreting the WLAD, *see Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 197 (Wash. 2014) (en banc), which defines "reasonable accommodation" as including:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(A), (B); *see also* WASH. PATTERN JURY INSTRUCTIONS – CIVIL § 330.34, 6A WASH. PRAC. (7th ed. 2022) (defining a reasonable accommodation as one that "enables the proper performance of the essential job functions" or "enables the enjoyment of equal benefits, privileges, or terms and conditions of employment that are available to employees without disabilities"). Plaintiff's request for information about the process of returning to work and her request for information about Giles's investigation (*see* Dkt. No. 59 at 14) are not requests that would modify Plaintiff's job duties to accommodate a disability, make RI's facilities more accessible to Plaintiff, or enable equal terms or conditions of employment.

## IV    CONCLUSION

Plaintiff's motion pursuant to Rule 59(e) (Dkt. No. 59) is GRANTED in part and DENIED in part. Plaintiff's claim of wrongful discharge in violation of public policy (based solely on Plaintiff taking leave) SHALL be reinstated. The remainder of Plaintiff's claims remain DISMISSED with prejudice. The Parties SHALL confer and submit a joint status report by **May 26, 2026**, informing the Court of their upcoming availability for trial through the remainder of the year so the Court may issue a new scheduling order.

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 23

The Clerk is directed to calendar this event.

The Court will also separately consider Defendants' motion to exclude the expert testimony of Tyson Bailey and Luke Fischer and the related briefing (Dkt. Nos. 35, 49, 54) in the context of Plaintiff's remaining claim.  The Clerk is directed to re-note the motion to exclude (Dkt. No. 35) for June 1, 2026.

Dated this 12th day of May 2026.

David G. Estudillo
United States District Judge

ORDER ON MOTION TO AMEND JUDGMENT (DKT. NO. 59) - 24